UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TRACEY WANG,<br><br>Plaintiff,<br><br>-against-<br><br>KONE INC.,<br><br>Defendant. | : | **ORDER**<br><br>23 Civ. 7659 (VMS) |

**Vera M. Scanlon, Chief United States Magistrate Judge:**

Plaintiff Tracey Wang ("Plaintiff") brings this suit alleging personal injuries arising out of a May 23, 2022, incident ("Incident") in a hotel elevator in Queens, New York. See ECF No. 12. Plaintiff alleges that Defendant Kone Inc. ("Defendant") was negligent in the ownership, operation, management, inspection, maintenance, repair, supervision and control of the elevator. Id. ¶ 21. Defendant moves to exclude Plaintiff's expert Richard Kennedy's opinions pursuant to Rule 702 of the Federal Rules of Evidence and to dismiss Plaintiff's Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. See ECF Nos. 33-37. The motion to exclude Mr. Kennedy's expert opinions is denied for the reasons described herein. In addition, because genuine issues of material fact remain in dispute, the motion for summary judgment is denied.

## I. FACTUAL BACKGROUND

The Court summarizes the factual background relevant to this order from Defendant's Rule 56.1 Statement of Material Facts, see ECF No. 36, and Plaintiff's Rule 56.1 Counterstatement of Material Facts, see ECF No. 39.

### a. Plaintiff's Work At The Hotel And Use Of The Subject Service Elevator

In 2019, Plaintiff started working as a room cleaner at the TWA Hotel located at 1 JFK Access Road, Idlewild Drive, Queens, New York ("Hotel"). See ECF No. 36 ¶¶ 1, 14 ("Def's

Rule 56.1 Statement"). Plaintiff worked full-time at the Hotel until May 23, 2022. Id. ¶ 15. Plaintiff and other housekeeping staff at the Hotel used the subject service elevator ("Service Elevator") daily to transport cleaning carts and equipment between floors. Id. ¶¶ 7, 16.

The Service Elevator is a traction-type elevator that was manufactured and installed by ThyssenKrupp Elevator circa 2018. Id. ¶¶ 2-3. It has both front and rear openings, each equipped with 48-inch center-parting doors. Id. ¶ 4. Each door includes a safety gate switch that monitors its position and prevents the Service Elevator from operating unless the corresponding door is fully closed. Id. The Service Elevator stops at the basement, floors 1 through 8, and the roof. Id. ¶ 5. Prior to May 23, 2022, Plaintiff testified that she did not have any incidents with the Service Elevator, that she was never warned by any Hotel supervisor about an issue with the Service Elevator, and that she never reported to any Hotel supervisor that she was concerned about using the Service Elevator.[1] Id. ¶¶ 17-19.

**b. Defendant's Maintenance And Repair Of The Service Elevator**

Defendant serviced and maintained the Service Elevator pursuant to an "Elevator/ Escalator Maintenance Property Level Agreement" with the Hotel, entered on June 15, 2020 ("Agreement"). Id. ¶ 8. The Agreement states in relevant part:

> 1. SCOPE OF SERVICES. The services covered by this Agreement include all preventive maintenance, testing, and repair or replacement of all vertical transportation components and systems. [Defendant] shall furnish all management, administrative support, engineering, supplies, materials, labor, labor supervision, tools, equipment, parts, accessories and lubricants necessary for complete preventive maintenance, testing, adjustment, replacement and repair as described below for the Equipment which comprises the complete vertical transportation systems as listed above located at the Customer Unit.

---

[1] Plaintiff adds that she and other employees were aware of a November 2021 incident involving an employee named Jean who was injured in the Service Elevator after it dropped several floors. See ECF No. 39 ("Pl.'s Rule 56.1 Counterstatement") ¶ 17. Plaintiff testified that Jean told her "try not to use that elevator" after Jean's experience but before Plaintiff's Incident. Id. ¶ 18. Such testimony is inadmissible hearsay.

> . . .
>
> 2. EXCLUDED SERVICES. The following are excluded from the scope of Services: (i) Repairs required because of … repairs, accident, vandalism or misuse of the Equipment by anyone other than the [Defendant], its employees, subcontractors, servants or agents, or other causes beyond the [Defendant's] control except ordinary wear and tear.

See ECF No. 34-6 ¶¶ 1-2. In the eight months preceding the Incident, the Service Elevator's doors were reported as damaged or knocked off their tracks on at least six occasions: (1) August 10, 2021; (2) August 16, 2021; (3) August 25, 2021; (4) August 31, 2021; (5) September 10, 2021; and (6) January 2, 2022. See ECF No. 36 ¶ 10 (citing ECF No. 34-7 at 7-10, 13, 26).[2] In the year preceding the Incident, Defendant performed preventive maintenance on the Service Elevator on four occasions: (1) June 30, 2021; (2) September 9, 2021; (3) December 20, 2021; and (4) March 7, 2022. Id. ¶ 12 (citing ECF No. 34-7 at 5, 14, 25, 41).[3] The maintenance time tickets do not state "safety circuit brake stops" involving a car door contact adjustment.[4] Id. ¶ 13; see ECF No. 35, McPartland Decl. ¶ 28.

---

[2] Plaintiff contends that the time tickets for these incidents show that Defendant had actual and constructive notice that the Service Elevator "had a known door operation/door alignment problem which Defendants repeatedly failed to properly maintain and repair." See ECF No. 39 ¶ 10. Plaintiff further argues that none of the time tickets constitutes admissible evidence that Hotel employees caused the elevator doors to be damaged or knocked off their tracks. Id.

[3] Plaintiff notes that on three of the four dates cited by Defendant, the mechanics spent thirty minutes or less performing the preventive maintenance tasks, which Plaintiff claims raises questions about the adequacy of such maintenance. See ECF No. 39 ¶ 12.

[4] Plaintiff acknowledges that Defendant's mechanics did not use the phrase "safety circuit brake stop," but argues that other time tickets are indicative of this condition. See ECF No. 39 ¶ 13 (citing ECF No. 38-6 at 1, 32 (8/19/2020 and 9/10/2021 tickets showing car came to an abrupt stop); ECF No. 38-6 at 9-11, 13, 45, 53-56, 61 (1/29/2021, 2/3/2021, 3/11/2021, 1/2/2022, 1/11/2022, 1/13/2022, 2/17/2022, and 4/1/2022 tickets showing the equipment "stopped" and "shut down"); ECF No. 38-6 at 8, 28, 67 (1/19/2021, 8/25/2021, and 5/23/2022 tickets showing an "entrapment" occurred)).

**c. The Incident**

On May 23, 2022, Plaintiff was working at the Hotel. See ECF No. 36 ¶ 20. At approximately 11:30 a.m., Plaintiff testified that she was on the Hotel's seventh floor, entered the Service Elevator alone and pushed the basement button. Id. ¶¶ 21-23. After the doors closed, Plaintiff testified that she did not hear anything out of the ordinary. Id. ¶ 24. Plaintiff testified that she was holding the Service Elevator's handrail at the time of the Incident. Id. ¶ 25. She further testified that the Service Elevator moved normally to the sixth floor, then suddenly "dropped" for five to ten seconds to the basement and she heard a "bang." Id. ¶ 26. Plaintiff testified that the lights did not flicker or flash during the Incident. Id. ¶ 27. Plaintiff's back and head did not hit the Service Elevator's floor, and her feet remained on the floor the entire time. Id. ¶ 28. Plaintiff said that her hands went to the Service Elevator's floor, but her chest and stomach remained in the air.[5] Id. ¶ 29. Plaintiff was stuck in the Service Elevator for approximately five minutes. Id. ¶ 30. When she exited, Plaintiff testified that the Service Elevator's doors opened fully and that the cab was level with the basement floor. Id. ¶ 31. Approximately two hours after the Incident, Defendant responded to the Hotel. Id. ¶ 32. Defendant's mechanic found the Service Elevator running but noted a door-operation issue and "adjusted the car door contacts." Id.

Both Defendant and Plaintiff's experts agree that "the Service Elevator performed a safety circuit brake stop at the time of the Incident, which was triggered by the door clutch striking the hoistway door release roller." See ECF No. 35, McPartland Decl. ¶ 22; see also ECF No. 38-7, Kennedy Report ¶ 4.15 ("It is my professional opinion . . . that the proximate cause of

[5] Plaintiff adds that she "repeatedly testified that her body fell to the floor of the elevator as a result of the accident." See ECF No. 39 ¶¶ 28-29.

this incident was the elevator door clutch hitting the hoistway door roller release unit thereby opening the safety circuit.").

**d. Plaintiff's Treatment After The Incident**

After the Incident, the New York City Fire Department responded to the Hotel and completed a Prehospital Care Report ("FDNY Report") that includes the following narrative history:

> UPON ARRIVAL ON SCENE 42 YEAR OLD FEMALE SITTING AT LOCATION. PATIENT STATED SHE WAS IN THE ELEVATOR AND IT DROOPED [sic] AND SHE COULDN'T GET OUT PATIENT STATED THE DOOR OPENED. PATIENT STATED SHE WAS JUST SHAKEN UP. PATIENT STATED THAT SHE DOSE [sic] NOT WANT TO GO TO THE HOSPITAL AND SHE IS GOING TO GO HOME AND GO THE [sic] HER DOCTOR IF ANYTHING CHANGES.
>
> . . .
>
> PATIENT DENIES, FALL, LOC, HEAD NECK OR BACK PAIN, HEADACHE, NAUSEA, VOMITING, PATIENT DENIES ANY OTHER PAIN OR DISCOMFORT AT THIS TIME. PATIENT HAD NO NOTED INJURERS [sic] AT THIS TIME.[6]

See ECF No. 34-12 at 5. Plaintiff testified that immediately after the Incident, she felt chest pain and difficulty breathing, but she did not ask the Emergency Medical Services to take her to the hospital and went home.[7] See ECF No. 36 ¶¶ 35-36. Approximately two hours after the Incident, Plaintiff testified that she sought treatment at New York-Presbyterian Hospital due to chest pain and difficulty breathing. Id. ¶ 37. The hospital provider note includes the following history of present illness:

---

[6] Plaintiff notes that in response to being read this portion of the FDNY Report, Plaintiff testified: "I fell inside the elevator. Probably my English is not good so they misunderstood me." See ECF No. 39 ¶ 34 (citing ECF No. 38-1 at 55).

[7] Plaintiff adds that she felt pain in her neck, back and shoulders the next day, so she went to see a doctor. See ECF No. 39 ¶ 35 (citing ECF No. 38-1 at 102).

> Patient states this morning at 11am she was on elevator at work when it suddenly dropped from the 5th to ground floor. She was holding on to the side rail and did not injured [sic] herself. She was stuck in the elevator for 5 min[utes] before she was able to get out. At that time, she had rime [sic] onset of left sided chest pain radiating to shoulder associated eighth [sic] difficulty breathing, palpitations and the shaking of both hands. She went home, and her symptoms worsened prompting her to come to ED. [E]ndorsed active chest pain.

See ECF No. 34-13 at 2. Plaintiff reported to the Hotel that the Incident "caus[ed] her to feel nervous with shortness of breath and chest pains." See ECF No. 36 ¶ 39 (citing ECF No. 34-14 at 2). Plaintiff's alleged injuries from the Incident include cervical spine disc herniations requiring anterior cervical discectomy and disc replacement at C4-C5 on July 6, 2023; lumbar spine disc bulges; right shoulder tendon tears requiring surgery on November 16, 2023; and left shoulder tendon tears. Id. ¶ 40 (citing ECF No. 34-5 at 6-10).[8]

## II. PROCEDURAL HISTORY

Plaintiff filed a complaint against Defendant in the Supreme Court of the State of New York, County of Queens, on June 26, 2023. See ECF No. 1 at 1. On October 13, 2023, Defendant removed the case to this Court based on diversity jurisdiction. Id. at 3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441 because Plaintiff is a resident and citizen of New York seeking damages exceeding $75,000 from Defendant, an Illinois corporation with its principal place of business in Illinois. Id. at 3-4. Accordingly, this case satisfies the diversity of citizenship and amount in controversy requirements. See 28 U.S.C. § 1332. The Court held an initial conference on December 7, 2023, and the case thereafter

[8] Plaintiff's Counterstatement of Material Facts adds additional purported facts, which the Court has also considered. See ECF No. 39 ¶¶ 41-49. On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party. Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC, 167 F.4th 605, 615 (2d Cir. 2026). It is not appropriate for the court to make credibility assessments or resolve conflicting versions of the events presented, as these are essential questions for a jury. Simpson v. City of N.Y., 793 F.3d 259, 265 (2d Cir. 2015).

proceeded to discovery. See 12/18/2023 Order. The Court certified completion of discovery on January 13, 2026. See 1/13/2026 Order. The instant briefing followed. See ECF Nos. 33-41. The Court held oral argument on October 15, 2026. See 10/16/2026 Order.

## III. DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT'S OPINIONS

Defendant seeks to exclude the opinions of Plaintiff's expert, Mr. Kennedy, on the grounds that the opinions are conclusory and ignore the evidentiary record. See ECF No. 37 at 14-17. Defendant also contends that Mr. Kennedy's opinion regarding Defendant's "failure of preventative maintenance" should be excluded because it is solely based on his ipse dixit. Id. at 17-19. In response, Plaintiff contends that Defendant's argument is "based entirely upon its unproven and speculative theory that hotel employees were striking the elevator doors with cleaning carts with sufficient force to knock the clutch and the rollers out of alignment." See ECF No. 40 at 19. Plaintiff further argues that Mr. Kennedy's opinions are not ipse dixit but instead based upon "his careful review of the contract requirements, the applicable industry standards, and . . . the time tickets." Id. at 20.

### a. Applicable Law

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides, in relevant part, that an expert qualified by

> knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

See Fed. R. Evid. 702. The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that Rule 702's admissibility requirements are satisfied. See

United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). "[T]he district court is the ultimate gatekeeper." Id. (internal quotations & citations omitted).

In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993), the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." The focus of the Court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. The Supreme Court further explained in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999), that the objective of the "gatekeeping" requirement of Daubert and Fed. R. Evid. 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." "The trial judge's gatekeeping obligation applies not only to testimony based on 'scientific' knowledge, as in Daubert, but also to testimony based on 'technical' or 'other specialized' knowledge." Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004) (quoting Kumho Tire, 526 U.S. at 141).

In order to assess whether expert testimony is sufficiently reliable, the court engages in a flexible inquiry under which it may consider the following factors: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the known or potential rate of error and the existence of standards controlling the technique's operation; and (4) whether the theory or technique has gained general acceptance in the relevant scientific community. See Daubert, 509 U.S. at 593-94; Zaremba, 360 F.3d at 358. The court must find that: "(1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue

will 'assist the trier of fact.'" In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 638 F. Supp. 3d 227, 242 (E.D.N.Y. 2022) (quoting Nimely v. City of N.Y., 414 F.3d 381, 396-97 (2d Cir. 2005)).

**b. Analysis**

Mr. Kennedy, Plaintiff's elevator expert, is a Qualified Elevator Inspector ("QEI") and Certified Elevator Technician ("CET"). See ECF No. 38-7 ¶ 1. Mr. Kennedy has owned an elevator consulting firm since 1981, and he founded an elevator systems company in 1982. Id. ¶ 2. He has worked in the elevator maintenance industry for more than fifty years. Id. Over the last forty years, Mr. Kennedy has extensive experience providing expert testimony in courts nationwide. Id. ¶ 3. In connection with this case, Mr. Kennedy inspected the Service Elevator on June 23, 2025; submitted a report on July 25, 2025; appeared for a deposition on January 4, 2026; and submitted a sworn affirmation on March 9, 2026. See ECF No. 38 ¶¶ 26-45; see also ECF No. 38-7 at 1-3, 8-21; ECF No. 38-8. At the outset of his report, Mr. Kennedy states that he was asked:

> to review the pertinent facts and records in this case to determine whether the conduct of the Kone Inc., and their employees, comported with applicable standards and practices in the elevator industry, and to examine that relationship, if any, between that conduct and the incident on May 23, 2022, on the #16 service elevator in the TWA Hotel at the JFK International Airport, New York, NY.

See ECF No. 38-7 at 8. Mr. Kennedy reviewed a myriad of materials, including Plaintiff's Complaint, the FDNY Report, the Agreement, the Kone Maintenance Method Manual, Defendant's maintenance time tickets, literature on elevator operation and maintenance, a site survey and Mr. McPartland's expert report. Id. ¶¶ 1.01-1.21.[9]

---

[9] During his deposition, Mr. Kennedy testified that he also reviewed Plaintiff's deposition. See ECF No. 38-8, Kennedy Tr. at 12:24-13:13.

Defendant specifically challenges the following conclusions by Mr. Kennedy:

- "A properly maintained elevator does not have excessive service interruptions and call backs as recorded within the evidence for the #16 elevator." Id. ¶ 4.03.

- "The failure to find and permanently repair the many causes for the call backs and promptly respond to [Defendant]'s IOT notices was the proximate cause of this incident." Id. ¶ 4.10.

- "[Defendant] failed to follow the proper standard of care afforded to the plaintiff by virtue of its specific knowledge and proper performance of the on-going maintenance effort which allowed for the progressive and additive deterioration of the reliability and performance of the #16 elevator." Id. ¶ 4.11.

- "The proximate cause of this incident was attributable to the deficient actions of [Defendant] and their employees, and their non-compliance with the applicable national standards and practices of the elevator industry and adherence to the ANSI Al 7.1 Code and their own MCP standards for maintenance and care of a complex instrument such as elevator #16." Id. ¶ 4.12.

- "[T]he proximate cause of the incident was foreseeable, due to recurring critical issues, entrapments, failure to respond to calls, overshooting the floors, and emergency stops which were never properly and permanently repaired in the time prior to this incident." Id. ¶ 4.13.

Defendant argues that Mr. Kennedy's opinions are conclusory and ignore the evidentiary record, emphasizing that Mr. Kennedy does not "identify a single component or mechanical or electrical deficiency that [Defendant] should have repaired to prevent the Incident." See ECF No. 37 at 16 (citing ECF No. 38-8, Kennedy Tr. at 31:13-15; 32:12-18; 33:17-34:2). Defendant contends that Mr. Kennedy improperly relies on service calls while ignoring that the calls were due to the Hotel staff's misuse and abuse of the Service Elevator, not any action or inaction by Defendant. Id. at 16-17. In addition, Defendant argues that Mr. Kennedy's "failure of preventative maintenance" opinion should be excluded because it is based solely on his ipse dixit. Id. at 17. Defendant notes that such "lack of maintenance" causation opinions have been

routinely rejected by courts as speculative and lacking evidentiary foundation. Id. at 17-18 (collecting New York cases from 2005-2012).

Applying the liberal standards outlined above, the Court declines to exclude Mr. Kennedy's testimony at this time. See Powell v. Schindler Elevator Corp., No. 14 Civ. 579 (WIG), 2015 WL 7720460, at *2 (D. Conn. Nov. 30, 2015) (denying motion to preclude expert's opinion "on what reasonable care is required when an elevator has a repeated but undiagnosed problem"); see also Morton v. Otis Elevator Co., No. 07 Civ. 469 (JTC), 2011 WL 2199848, at *10 (W.D.N.Y. June 7, 2011) (denying motion to preclude expert's opinion that the cause of an elevator incident was "due to excessive wear and tear resulting from insufficient preventative maintenance"); Stewart v. World Elevator Co, Inc., 84 A.D.3d 491, 922 N.Y.S.2d 375 (N.Y. App. Div. 1st Dep't 2011) (holding the trial court erred by dismissing an expert opinion as "speculative," where the expert "had 38 years of experience in elevator construction, installation, maintenance and repair" and directly refuted the opposition's expert opinion). The Court finds that Mr. Kennedy's qualifications, considered in conjunction with the substance of his report and deposition testimony, provide a sufficient basis to conclude that Mr. Kennedy possesses the requisite knowledge, skill, experience, training and education that would assist the trier of fact in understanding the evidence and issues in this case regarding the operation and maintenance of the Service Elevator. See Fed. R. Evid. 702; see also United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004) (holding that a witness is qualified where he has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony"). Mr. Kennedy has spent decades working in the elevator industry, including as an expert consultant, and this experience is a valid basis for his opinions on whether the conduct of Defendant comported with

applicable standards and practices, and the relationship, if any, between that conduct and the Incident. See ECF No. 38-7 at 8.

Mr. Kennedy formulated his opinions after a review of the evidentiary record and an inspection of the Service Elevator, albeit several years after the Incident. Mr. Kennedy explained that there are certain "reliable service" metrics, and an elevator will be deemed as unreliable if it: (1) exceeds two entrapments per year; (2) exceeds four callbacks per year; and (3) exceeds two callbacks per month for three consecutive months." See ECF No. 38-7 ¶ 3.02.5. Mr. Kennedy noted "Key Performance Indicators" for assessing reliability, including: (1) callbacks not to exceed three per quarter; (2) mean time between callbacks not to be less than sixty days during any rolling twelve-month period; (3) response time to callbacks during regular time not to exceed one hour; and (4) response time during overtime not to exceed two hours. Id. ¶ 3.02.6. Upon review of the tickets, Mr. Kennedy found that in the 377 days preceding the Incident, there were three entrapments, eight equipment failures, four door issues, six control system faults, and one power failure, resulting in twenty-five alerts from Defendant's 24/7 Performance Analysis device indicating that the elevator was not operating properly. Id. ¶¶ 3.09-3.09.01. Five of these alerts involved a car stopping between floors and recovering, like Plaintiff's experience. Id. ¶ 3.09.2. Mr. Kennedy calculated that the Service Elevator reported issues every 8.5 days on average. Id. ¶ 3.10.1. The Court finds that Mr. Kennedy provided a foundation for his opinions. See Fed. R. Evid. 702.

In addition, where a plaintiff alleges improper maintenance and inspection of an elevator, expert opinion regarding what could have caused an incident may be proper. See Syrnik v. Bd. of Managers of Leighton House Condo., 198 A.D.3d 835, 156 N.Y.S.3d 81 (N.Y. App. Div. 2nd Dep't 2021). In the Syrnik case, New York's Appellate Division, Second Department, denied

the defendant elevator company's motion for summary judgment based on facts that closely resemble the instant case. Id. at 837-38. In Syrnik, the defendant elevator company submitted, among other things, the affidavit of Patrick McPartland—the same expert that Defendant has retained here. Id. at 836-37. As in the instant case, Mr. McPartland opined that the cause of the elevator's drop and abrupt stop was "a clipping of a door lock." Id. Mr. McPartland further opined that defendant's mechanics could not prevent the clipping of a door lock "in the course of inspecting, testing, and servicing" the elevator due to "other persons and instrumentalities that either strike/hit the elevator doors or leave debris/objects in the elevator door sill." Id. at 837. As in the instant case, the plaintiff's expert agreed that "the probable cause of the accident was a clipped interlock," but disagreed with Mr. McPartland's opinion that this condition could not have been prevented through inspection and maintenance. Id. Plaintiff's expert further disagreed with Mr. McPartland's opinion that the accident was necessarily the result of external factors, such as a person hitting the elevator doors. Id. The Syrnik Court found that the plaintiff's expert's opinion "was not speculative, conclusory, or lacking in foundation" and raised a triable issue of fact, ruling in the plaintiff's favor to allow trial to go forward. Id. The Court finds the same here.

Although the Court agrees with Defendant that several of Mr. Kennedy's opinions appear general and conclusory, such as those related to the "proximate cause" of Plaintiff's Incident, the proper approach is not to exclude them entirely. Rather, Defendant may attack the reliability of these opinions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596 (noting these "are the traditional and appropriate means of attacking shaky but admissible evidence"). The parties may also file motions in limine to preclude the testimony of each other's experts at trial in whole or in

part. See Linwood v. Schindler Elevator Corp., No. 16 Civ. 1020 (LAK) (RWL), 2019 WL 5722110, at *3 n.5 (S.D.N.Y. Jan. 25, 2019) (accepting that the plaintiff's expert was an expert for purposes of reviewing a summary judgment motion while noting that "[t]o what extent" the plaintiff's expert was a "qualified expert" was "open to question"). Given the current posture of this case and the various genuine issues of material fact discussed below, see infra Part IV(b), including that Mr. Kennedy's opinions are not central to the denial of this motion, the Court declines to exclude Mr. Kennedy's testimony for purposes of assessing the summary judgment motion.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant seeks summary judgment on the grounds that: (1) Defendant did not owe a duty to Plaintiff because the Incident was caused by the Hotel staff's misuse of the Service Elevator; (2) Defendant had no control over the misuse of the Service Elevator or actual or constructive notice of any elevator defect; and (3) the Service Elevator was serviced and maintained in accordance with industry standards and Defendant's obligations under the Agreement. See ECF No. 37 at 10-14. Plaintiff argues that: (1) there is no admissible evidence that Hotel staff "misused" or damaged the Service Elevator; (2) Defendant owed a duty of care to Plaintiff via the comprehensive Agreement it entered with the Hotel; (3) Defendant had actual and constructive notice that the Service Elevator had a known recurring door operation problem, yet repeatedly failed to adequately address this problem; (4) Defendant failed to use reasonable care to discover and correct a defect of which it ought to have found; and (5) the doctrine of res ipsa loquitur also precludes summary judgment. See ECF No. 40 at 5-18.

**a. Applicable Law**

**i. Summary Judgment**

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," thereby helping courts avoid "protracted, expensive and harassing trials." Celotex, 477 U.S. at 323-24; Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). On a motion for summary judgment, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Reyes v. Lincoln Auto. Fin. Servs., 861 F.3d 51, 54 (2d Cir. 2017), as amended (Aug. 21, 2017) (citing Burg v. Gosselin, 591 F.3d 95, 97 (2d Cir. 2010) (alterations omitted)).

The district court's role is not "'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. See Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (citing Celotex, 477 U.S. at 323). If the moving party makes this initial showing, the burden shifts to the party resisting summary judgment "to present evidence sufficient to satisfy every element of the claim." Id. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material

facts, and may not rely on conclusory allegations or unsubstantiated speculation." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (citing Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011)).

**ii. Negligence**

To establish a prima facie case of negligence under New York[10] law, the plaintiff must demonstrate: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006) (quotation marks & citations omitted). An elevator company that agrees to maintain an elevator in safe operating condition "owes a duty of maintenance and can be liable to a passenger for 'failure to correct conditions of which it had knowledge,' or 'failure to use reasonable care to discover and correct a condition which it ought to have found.'" Green v. Schindler Elevator Corp., No. 19 Civ. 4677 (LLS), 2022 WL 4484542, at *4 (S.D.N.Y. Sep't 27, 2022) (quoting Ulerio v. Schindler Elevator Corp., No. 12 Civ. 1496 (DF), 2014 WL 1303710, at *4 (S.D.N.Y. Mar. 26, 2014) (alterations to original). An elevator company may establish "entitlement to summary judgment by presenting 'competent evidence in admissible form showing that the elevator was functioning properly before and after the accident, and that, even if a defect existed, the company did not have actual or constructive notice of any such defect.'" Marcano v. Schindler Elevator Corp., No. 23 Civ. 201 (JMF), 2024 WL 4827405, at *3 (S.D.N.Y. Nov. 19, 2024) (quoting Ulerio, 2014 WL 1303710, at *4) (alterations to original).

---

[10] New York substantive law applies to this diversity action. See Shoifet v. N.Y. Cent. R.R. Co., 265 F.2d 208, 208 (2d Cir. 1959) ("As federal jurisdiction is based on diversity of citizenship, and the accident occurred in New York, the substantive aspects of the case are governed by New York law.").

Upon the defendant elevator company's prima facie showing, "the plaintiff must come forward with evidence capable of showing that the defendant either: '(1) created the defect; or (2) had actual or constructive notice of the defect.'" Meade v. Otis Elevator Co., No. 15 Civ. 4822 (LTS) (HBP), 2017 WL 6509259, at *6 (S.D.N.Y. Dec. 18, 2017) (quoting Ulerio, 2014 WL 1303710, at *4). To constitute constructive notice, "the alleged defect must have been 'visible and apparent' and must have existed 'for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it.'" Looney v. Macy's Inc., 588 F. Supp. 3d 328, 342 (E.D.N.Y. 2021) (quoting Antonelli v. Wal-Mart Stores, Inc., 216 F.3d 1071, 2000 WL 876785, at *1 (2d Cir. 2000)); see Gordon v. Am. Museum of Nat. Hist., 67 N.Y. 2d 836, 837 (N.Y. 1986) ("To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it."). "Alternatively, a plaintiff can establish constructive notice through evidence that the defendant was aware of an ongoing and recurring unsafe condition which regularly went unaddressed." Bogery v. United States, No. 17 Civ. 6996 (VEC), 2018 WL 4265901, at *3 (S.D.N.Y. Sept. 6, 2018) (quotations & citations omitted).

**iii. Res Ipsa Loquitur**

The doctrine of res ipsa loquitur "enables a plaintiff to prevail in a certain type of circumstance in proving negligence even though the plaintiff cannot show exactly who or what caused [the] injury." Manhattan by Sail, Inc. v. Tagle, 873 F.3d 177, 180 (2d Cir. 2017). To prevail on this theory, the plaintiff must prove three elements: "(1) the event is of a type that ordinarily would not occur in the absence of negligence; (2) it is caused by an agency or instrumentality under the exclusive control of the party charged with negligence; and (3) it is not due to any voluntary action or contribution on the part of injured party." Id. (citing Sojak v.

Hudson Waterways Corp., 590 F.2d 53, 55 (2d Cir. 1978) (per curiam)). The plaintiff need not "eliminate with certainty all other possible causes or inferences." Id. at 181. Instead, the plaintiff "must show that the incident in question probably resulted from the negligence of the defendant." Skidd v. JW Marriot Hotels & Resorts, No. 06 Civ. 1554 (DAB), 2010 WL 2834890, at *3 (S.D.N.Y. July 8, 2010) (citing Nesbit v. N.Y.C. Transit Auth., 170 A.D.2d 92, 574 N.Y.S.2d 179 (N.Y. App. Div. 1st Dep't 1991)).

**b. Analysis**

**i. Negligence**

For the reasons detailed herein, Defendant fails to establish entitlement to summary judgment under a traditional negligence theory.

It is helpful to first examine the parties' respective theories of the case. Of ninety-four tickets disclosed by Defendant, Plaintiff notes that sixty-seven pertained to service calls that occurred between August 19, 2020 (the earliest ticket produced), and May 23, 2022 (the date of Plaintiff's Incident), and many of the tickets evidenced a recurring door-operation problem in the Service Elevator. See ECF No. 38 at 8-10. Plaintiff argues that the specific mechanism of the elevator that malfunctioned—the misalignment of the car door clutch and the hoistway door rollers—was within Defendant's exclusive control. See ECF No. 40 at 18. Plaintiff notes that the "time tickets provide overwhelming evidence that the subject elevator had a known door operation problem for over a year prior to [Plaintiff's] accident." Id. at 11. There were several instances of elevator entrapments and emergency or sudden stops, which are consistent with Plaintiff's experience. See, e.g., ECF No. 38-6 at 8, 28, 32, 67, 77. In addition, there were numerous instances when the Service Elevator's 24/7 connected service detected faults in the elevator's operation and automatically alerted Defendant. See generally ECF No. 38-6. During

the twenty-one months preceding the Incident, Defendant received at least twelve calls "from the hotel complaining about entrapped passengers, sudden stops, loud noises or bouncy rides in the elevator, and on almost all of those occasions, [Defendant's] mechanic was required to make an adjustment to the doors or their components." See ECF No. 40 at 12. During this same period, "the 24/7 connected service device detected emergency stops, vertical vibrations, or sudden stops before recovering on over 20 occasions." Id. Plaintiff's expert, Richard Kennedy, opines that "the proximate cause of [Plaintiff's] accident was [Defendant's] failure to take the necessary steps to ensure safe and reliable operation of the subject elevator through its inspection, maintenance, testing, and repair efforts, and its failure to find and permanently repair the known door operation problem." See ECF No. 38-7, Kennedy Aff. ¶ 8.

Defendant's theory in support of its motion for summary judgment is that Hotel staff "misused" the elevator by striking the elevator doors with their cleaning carts, and the subsequent elevator door damage and misalignment caused the Service Elevator to perform a safety circuit brake stop during the Incident. See ECF No. 37 at 10-14. Defendant contends it did not owe a duty of care to Plaintiff because the Incident was caused by "misuse of the Service Elevator, not any maintenance deficiencies or any action or inaction by [Defendant]." Id. at 11. Defendant further asserts "it is not liable to Plaintiff because it did not create or exacerbate the condition that resulted in the Incident." Id. In support, Defendant notes that its expert, Patrick McPartland, surmised that "[i]t is common for housekeeping carts to come into contact with the elevator doors, which can lead to misalignment or damage of door components." Id. (citing ECF No. 35, McPartland Decl. ¶ 24). Defendant further highlights that "[t]he Service Elevator's doors were reported as damaged or knocked off their tracks on at least six occasions in the eight months preceding Plaintiff's incident." Id. (citing ECF No. 34-7 at 7-10, 13, 26). After the

Incident, Defendant again found a door operation issue and adjusted the car door contacts. See ECF No. 37 at 13; ECF No. 35, McPartland Decl. ¶ 25 (citing ECF No. 34-7 at 48). Mr. McPartland opined that "[s]uch elevator door damage and misalignment may cause the Service Elevator to perform a safety circuit brake stop like here because the necessary signal is not transmitted, prompting the elevator to stop mid-travel as a safety precaution." See ECF No. 37 at 11 (citing ECF No. 35, McPartland Decl. ¶ 24). Defendant argues that because Defendant did not create or exacerbate the condition that resulted in the Incident, it is not liable. Id.

Defendant attempts to analogize the instant case to Maldonado, in which New York's Appellate Division, First Department, affirmed the granting of summary judgment where the defendant elevator company presented "testimony of its employees that the malfunctioning of the freight elevator was caused by a misalignment of the elevator doors due to the knocking of shopping carts, pallet jacks and U-boat carts into the doors by supermarket employees," and, therefore, the defendant "did not create or exacerbate the dangerous condition." See Maldonado v. Liberty Elevator Corp., 213 A.D.3d 493, 493-94, 183 N.Y.S.3d 399 (N.Y. App. Div. 1st Dep't 2023). Unlike Maldonado, Defendant does not offer evidence showing that the Hotel staff hit cleaning carts into the Service Elevator doors with such force so as to cause the doors to become damaged or misaligned. See generally ECF No. 37. There is no testimony from anyone who saw this occur. Id. Instead, Defendant relies on six maintenance tickets, which include restatements about the cause of the door issues, and Mr. McPartland's opinion about what might have caused the door-operation issue. Id. Defendant does not offer uncontroverted evidence that the Hotel staff's misuse of the Service Elevator resulted in the Incident.

Plaintiff responds that the six maintenance tickets on which Defendant relies do not demonstrate "that hotel employees were misusing the elevator or striking the doors with cleaning

carts, or that it happened just before Plaintiff's accident." See ECF No. 40 at 7. The six tickets are summarized below:

| DATE AND TIME | CUSTOMER REQUEST | DESCRIPTION OF WORK |
|---|---|---|
| August 10, 2021<br><br>Arrive 17:53, Leave 20:12 | Loud banging noise while car is in motion | "This callout was due to an impact to the cab door and is therefore billable." See ECF No. 34-7 at 7. "James Messina called on 8/9/2021 at 4:13 PM reporting an operating problem with the #16 SERVICE ELEVATOR. When we arrived . . . the unit was at floor with the doors closed. We repaired the car door clutch; repaired the door operator, and checked the operation of the control system. . . . [W]e left the elevator in service." Id. |
| August 16, 2021<br><br>Arrive 12:14, Leave 12:21 | Rubbing and banging noise while in motion | "This callout was due to an impact to the car door strike post and is therefore billable." See ECF No. 34-7 at 8.<br>"James Messina called on 8/16/2021 at 7:08 AM reporting an operating problem with the #16 SERVICE ELEVATOR. We arrived . . . and found the door knocked off the track. We re-hung the door and adjusted it for proper and safe operation. The elevator was restored to normal operation. This condition is not preventable through routine maintenance, and thus is outside the scope of the KONE Service Agreement."[11] Id. |
| August 25, 2021<br><br>Arrive 9:23, Leave 10:43 | Entrapment floor 4, one person, no medical issue | "Elev Check Recording Phone called on 8/25/2021 at 8:34 AM reporting an emergency on the #16 SERVICE ELEVATOR. When we arrived . . . the unit was at floor with the doors closed. We adjusted the car door. Upon leaving . . . we left the elevator in service." See ECF No. 34-7 at 9. |
| August 31, 2021<br><br>Arrive 9:53, Leave 11:45 | Our Service Elevator in the Hughes Tower is out of operation | "James Messina called on 8/30/2021 at 8:53 AM reporting an operating problem with the #16 SERVICE ELEVATOR. We arrived . . . and found the door knocked off the track. We re-hung the door and adjusted it for proper and safe operation. The elevator was restored to normal operation. This condition is not preventable through routine |

[11] The end of the "Description of Work" is cut off but appears to indicate that the service was "100% billable." See ECF No. 34-7 at 8.

| | | |
|---|---|---|
| | | maintenance, and thus is outside the scope of the KONE Service Agreement. It is 100% billable." See ECF No. 34-7 at 10. |
| September 10, 2021<br><br>Arrive 16:35, Leave 17:46 | Car came to abrupt stop around 6 or 7. Car call went out. Pressed 1 again and car went down to 1. | "James Messina called on 9/10/2021 at 1:49 PM reporting an operating problem with the #16 SERVICE ELEVATOR. When we arrived . . . the unit was running with a door operation problem. We adjusted the landing door pick-up rollers. Upon leaving . . . we left the elevator in service." See ECF No. 34-7 at 13. |
| January 2, 2022<br><br>Arrive 9:00, Leave 10:00 | Stopped at floor 1 with doors closed. | "James Messina called on 1/1/2022 at 9:55 PM reporting #16 SERVICE ELEVATOR was shut down. When we arrived . . . the unit was running with a door operation problem. We checked the operation of the freight door contacts. Upon leaving . . . we left the elevator in service. This service is outside the scope of the KONE Service Agreement, and is thus 100% billable." See ECF No. 34-7 at 26. |

It is noteworthy that the statements of the alleged cause of the incidents are unsupported by any evidence about staff conduct and seem related to the question of whether the call out was separately billable, and thus could be seen as self-serving statements.

Resolving all ambiguities and drawing all permissible factual inferences in favor of Plaintiff, see Reyes, 861 F.3d at 54, the record before the Court presents several genuine triable issues of fact. First, there is a genuine issue of material fact as to whether a door issued caused the sudden stop, and even if it did, what caused the doors to be knocked off track prior to the Incident. As Plaintiff notes, five of these six tickets occurred within the one-month period of August 10, 2021, to September 10, 2021, which was nine months prior to the Incident. See ECF No. 40 at 7 (citing ECF No. 34-7 at 7-10, 13). Although the August 16, 2021, and August 31, 2021, tickets state that the door was "knocked off the track" and other tickets reference a "door operation problem," as noted above, there is no explicit indication that these problems were

caused by Hotel employees hitting the doors with their cleaning carts. See id. at 7-8 (citing ECF No. 34-7 at 7-10, 13, 26). After Defendant's employee re-hung the door on August 31, 2021, that specific problem did not re-occur for the next nine months, until Plaintiff's Incident. Id. at 8 (citing ECF No. 38-6). As there is no report that the elevator had been taken out of service during that period, it is a reasonable inference that staff did not abuse or misuse the doors in that period. Plaintiff emphasizes how Defendant's expert, Mr. McPartland, acknowledged that the door rollers can be knocked off the tracks for reasons unrelated to abuse or misuse, such as worn components or misalignment. Id. (citing ECF No. 38-9 at 69-70).

Second, there is a genuine issue of material fact as to whether Defendant owed a duty to Plaintiff. Plaintiff has presented evidence that Defendant had a duty to inspect, maintain and repair the Service Elevator based on the Agreement. See Green, 2022 WL 4484542, at *4 (quoting Ulerio, 2014 WL 1303710, at *4) (discussing how an elevator company that agrees to maintain an elevator in safe operating condition "owes a duty of maintenance and can be liable to a passenger for 'failure to correct conditions of which it had knowledge,' or 'failure to use reasonable care to discover and correct a condition which it ought to have found.'"). During his deposition, Defendant's regional district adjuster, Michael Cooney, answered affirmatively that it would "be fair to say . . . that the duty to inspect, maintain, and repair the elevators at the TWA Hotel was assumed by [Defendant] pursuant to the service contract." See ECF No. 38-5 at 33. The Agreement states that the covered services "include all preventive maintenance, testing, and repair or replacement of all vertical transportation components and systems." See ECF No. 34-6 ¶ 1. Although there is a provision that excludes "repairs, accident, vandalism or misuse of the Equipment by anyone other than the [Defendant], its employees, subcontractors, servants or agents, or other causes beyond the [Defendant's] control except ordinary wear and tear," see id. ¶

2, as discussed above, there exists a genuine triable issue of fact as to whether the issue that resulted in the Incident was caused by Hotel staff misuse, which would be outside of Defendant's duty of care. Given the conflicting evidence presented on this issue, a triable issue of fact remains as to whether Defendant owed a duty of care to Plaintiff. See Reyes, 861 F.3d at 54.

Assuming arguendo that Defendant owed a duty to Plaintiff, there is also a genuine issue of material fact as to whether Defendant failed to use reasonable care in performing maintenance of the elevator such that it failed to discover and correct a hazardous condition. Defendant, via its expert Mr. McPartland, contends that it "serviced and maintained the Service Elevator in accordance with industry standards and its contractual obligations." See ECF No. 37 at 14 (citing ECF No. 35, McPartland Decl. ¶ 28). In the year prior to the Incident, Defendant performed preventative maintenance on four dates: (1) June 30, 2021; (2) September 9, 2021; (3) December 20, 2021; and (4) March 7, 2022. Id. (citing ECF No. 34-7 at 5, 14, 25, 41). Plaintiff via its expert, Mr. Kennedy, argues that "the proximate cause of this accident was Defendant's failure to properly inspect, maintain, test, or repair the subject elevator in compliance with industry standards and the requirements of their service contract with the hotel." See ECF No. 40 at 12-13 (citing ECF No. 38-7 ¶¶ 4.10-4.14). Although Mr. Kennedy acknowledged that the Kone Maintenance Method Manual's directives "meet the criteria for conformance" to the industry standards, Mr. Kennedy found that "the maintenance mechanic performed dedicated maintenance on [the Service Elevator] approximately 3.12 hours between 5/1/21 and 5/23/22. Industry practices and industry publications recommend a minimum of 2-3 hours per month." ECF No. 38-7 ¶¶ 3.05-3.07. Thus, the parties' differing expert opinions raise questions as to the adequacy of Defendant's maintenance of the Service Elevator. See McCall v. Alma Realty Corp., 236 A.D.3d 1013, 1014, 230 N.Y.S.3d 357, 359 (N.Y. App. Div. 2nd Dep't 2025)

(finding a "triable issue of fact as to whether the maintenance performed by [the elevator company] was comprehensive enough to discover and correct the allegedly unsafe condition of the elevator").

Third, the record before the Court presents a genuine triable issue of fact as to whether Defendant had notice of the alleged defect in the elevator. See Skidd, 2010 WL 2834890, at *4. Plaintiff emphasizes that Defendant received many customer calls about problems with the Service Elevator and particularly with its doors, and Defendant repeatedly sent its mechanic to repair the elevator, always leaving it in service. See generally ECF No. 38-6. Although some of Defendant's tickets note conditions that are "not preventable through routine maintenance" and therefore "outside the scope of the KONE Service Agreement," the fact that Defendant repeatedly repaired the Service Elevator but left it in service belies Defendant's argument that it was not on notice about an ongoing, potentially dangerous condition. See ECF No. 38-6 at 27, 29, 30-31, 61-62, 66, 68. A rational jury could find that, at minimum, Defendant had constructive notice based on "evidence that the defendant was aware of an ongoing and recurring unsafe condition which regularly went unaddressed." Bogery, 2018 WL 4265901, at *3. Constructive notice can also be established based on complaints showing "visible and apparent" defects in the elevator's normal operation, and (2) sufficient time existed between the complaints and Plaintiff's incident to permit Defendant to discover and remedy the condition. See Gordon, 67 N.Y.2d at 837; see also Morton, 2011 WL 2199848, at *7 (finding "sufficient support for a reasonable jury to infer that [defendant] had actual or constructive notice of a defective condition which could cause the elevator doors to malfunction").

For the foregoing reasons, summary judgment is denied under a traditional negligence theory.

**ii. Res Ipsa Loquitur**

Defendant also contends that, to the extent Plaintiff's claims are grounded in the doctrine of res ipsa loquitur, the claims must fail because the doctrine is inapplicable to this case. See generally ECF No. 37 at 19-21. Defendant argues that Plaintiff "cannot identify the instrumentality that allegedly caused her injuries," which alone makes the doctrine inapplicable. Id. at 19. Defendant asserts that Plaintiff cannot establish that the Service Elevator was within Defendant's exclusive control. Id. at 20. Defendant further argues that the Incident occurred in the absence of negligence, as it was caused by the Hotel staff's misuse resulting in door damage and misalignment. Id. at 20-21. In response, Plaintiff contends it meets the elements of res ipsa loquitur, and summary judgment should also be precluded under this theory. See ECF No. 40 at 15-18. Plaintiff asserts "it cannot reasonably be argued that a member of the public or that hotel employees tampered with the internal mechanics of the elevator such as the car door clutch or the hoistway door rollers." Id. at 17. Plaintiff argues that she has identified the specific mechanism of the elevator that malfunctioned—the misalignment of the car door clutch and the hoistway door rollers—which was within Defendant's exclusive control. Id. at 18.

Construing all evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has sufficiently demonstrated the three elements necessary to permit her case to be presented to a jury on a theory of res ipsa loquitur. See Reyes, 861 F.3d at 54. First, Plaintiff has sufficiently offered evidence to show that the Incident was "of a type that ordinarily would not occur in the absence of negligence." See Manhattan by Sail, 873 F.3d at 180. Courts applying New York law have routinely held that an elevator accident in which the elevator car rapidly descends before stopping is the type of event that does not normally occur in the absence of negligence. See, e.g., Livecchi v. Otis Elevator Co., No. 18 Civ. 333 (LJV), 2024 WL

1344789, at *9 (W.D.N.Y. Mar. 30, 2024) (collecting cases where New York courts held that a sudden elevator drop is the kind of event to which the doctrine of res ipsa loquitur applies); Gonzalez v. Otis Elevator Co., No. 09 Civ. 8905 (GBD), 2012 WL 993476, at *3 (S.D.N.Y. Mar. 26, 2012) ("[C]ommon sense establishes that an adequately maintained elevator should not come to an unexpected and abrupt stop causing injuries to its passengers."); Rivera v. Slade Indus., Inc., 199 A.D.3d 536, 537, 157 N.Y.S.3d 426 (N.Y. App. Div. 1st Dep't 2021) ("An elevator drop is the type of event that does not normally occur in the absence of negligence.").

Second, Defendant contracted to maintain the Service Elevator and the contracted services included "all preventive maintenance, testing, and repair or replacement of all vertical transportation components and systems," thereby demonstrating Defendant may have controlled the instrumentality that caused the damage. See Manhattan by Sail, 873 F.3d at 180; ECF No. 34-6 ¶ 1. Defendant argues that "because the Service Elevator was in continuous use by the Hotel staff, including Plaintiff and other housekeeping staff to transport cleaning carts and equipment between floors," this negates Defendant's exclusive control. See ECF No. 37 at 20. Under New York law, however, "[i]t is not necessary for the application of the res ipsa loquitur doctrine that there be but a single person in control of that which caused the damage." Stone v. Courtyard Mgmt. Corp., 353 F.3d 155, 159 (2d Cir. 2003) (quotations & citation omitted). "This is because exclusive control is not a rigid concept; rather, it is 'subordinated to its general purpose, that of indicating that it probably was the defendant's negligence which caused the accident.'" Id. (quoting Corcoran v. Banner Super Mkt., Inc., 19 N.Y.2d 425, 432, 280 N.Y.S.2d 385, 389 (N.Y. 1967)). If an elevator company has an exclusive maintenance contract, as is the case here, "[s]uch an undertaking renders the elevator at issue in [the defendant's] exclusive control of its maintenance, sufficient to meet the second element of the doctrine." Gonzalez,

2012 WL 993476, at *3 (citing Rogers v. Dorchester Assocs., 32 N.Y.2d 553, 561, 347 N.Y.S.2d 22, 28 (N.Y. 1973)).

It is undisputed that on the date of the Incident, May 23, 2022, Defendant had a contract to maintain the Service Elevator. See ECF No. 36 ¶ 8; ECF No. 39 ¶ 8. Defendant does not present any other evidence to suggest a different entity had control over the inspection, maintenance, or operation of the Service Elevator. See Linwood, 2019 WL 5722110, at *11 (holding maintenance company had exclusive control of the elevator at issue based on its exclusive maintenance contract). But see Sanchez v. 1067 Fifth Ave. Corp., 192 A.D.3d 521, 522, 145 N.Y.S.3d 19, 21 (2021) (finding exclusivity requirement was not met where defendant "ceded all maintenance and repair responsibility" to another company). Third, neither party suggests that the Incident was the result of "any voluntary action or contribution on the part of [Plaintiff]." Manhattan by Sail, 873 F.3d at 180. Regarding Defendant's contention that the Incident could have occurred without negligence, Plaintiff "need not conclusively eliminate the possibility of all other causes of the injury." See Kambat v. St. Francis Hosp., 89 N.Y.2d 489, 494 (N.Y. 1997).

Based on the record presented, Plaintiff has made the necessary showing for her res ipsa loquitur claim to be presented to a jury. Therefore, summary judgment on this basis is also denied.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion to exclude the expert testimony of Mr. Kennedy and motion for summary judgment are denied.

The Court reminds the parties of the following pretrial deadlines. The parties must file a proposed joint pretrial order ("JPTO") by January 7, 2027. Counsel should include their

position(s) as to whether to bifurcate liability and damages at trial. Any motions in limine are to be filed by January 14, 2027, with oppositions to be filed by January 21, 2027. No replies are permitted. Proposed joint draft jury instructions must be filed by January 28, 2027. Jury instructions need only include substantive jury instructions and any unusual instructions that a party requests. To the extent the parties disagree on the jury instructions, they should provide a red-lined copy with their proposed alternate instructions. A Word copy of the witness list and proposed jury instructions must be emailed to scanlon_chambers@nyed.uscourts.gov. Two binders with a complete set of exhibits from each side are to be delivered to Chief Magistrate Judge Scanlon's chambers, Room 1214, via the Clerk's Office, on or before January 28, 2027. Optional pretrial briefs are to be filed by February 4, 2027; any such brief should be limited to unusual legal issues that may arise at trial. To the extent that counsel intend to use technology in their presentations, they should contact the Court's IT staff and Judge Scanlon's deputy to coordinate. They are informed that Judge Scanlon's courtroom, Courtroom 13A South, has limited computer equipment. If a party needs an interpreter, counsel must make the necessary arrangements for simultaneous interpretation to take place during the trial. Although a court-certified interpreter is not required, counsel may not serve as the interpreter. A court-certified interpreter is necessary for any witness whose testimony is offered.

A pretrial conference will be held in person on February 11, 2027, at 2:00 PM in Courtroom 13A South before Chief Magistrate Judge Vera M. Scanlon. Jury selection will take place February 22, 2027, at 10:30 AM in Courtroom 13A South before Chief Magistrate Judge Vera M. Scanlon. Counsel and the parties should arrive no later than 10:00 AM. The Court has allotted two weeks for this trial. The parties are encouraged to pursue settlement discussions, including possibly via mediation.

Dated: Brooklyn, New York
November 12, 2026

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge